[No. 30345. Department Two. April 15, 1948.]

MERTON CHARLES STEWART, SR., *et al., Respondents,* v. RALPH K. Moss *et al., Appellants.*[1]

[1]Reported in 192 P. (2d) 362.

 

*J. Peter P. Healy,* for appellants.

*A. L. Lee,* for respondents.

Robinson, J.—On April 19, 1946, Ralph K. Moss and Grace E. Moss, his wife, were the owners of a logging truck and a trailer which were subject to a mortgage to the National Bank of Washington, on which there was then due a sum in excess of $3,600. On that day, their brokers, Leo and Wellman, through their representative, H. G. Jensen, received $500 from Merton Charles Stewart, Sr., and Merton Charles Stewart, Jr., and gave them an earnest-money receipt which read as follows:

"Leo & Wellman Business Sales
"1109½ 'A' Street BR. 5181
"Earnest Money Receipt

"Tacoma, Washington April 19, 1946
"Received Of Merton Charles Stewart, Sr. & Merton Charles Stewart, Jr. the sum of Five Hundred and no/100 Dollars ($500.00) as earnest money and part payment for the following described property and business, commonly known as ........................................ located at ........................................ .

"The sale price of said property is to be Fifty Five Hundred Dollars, ($5500.00) including Good Will, upon the following terms and conditions:

"1942 Ford Truck (Logging) Trailer and miscellaneous equipment, license plates and all extra tires.

"An additional payment of $500.00 to be made on or before April 22nd, 1946.

"An additional $2500.00 is due and payable on or before May 18, 1946. The remaining balance of $2000.00 is due and payable on or before May the 24th, 1946.

"The seller agrees to comply with the Bulk Sales Act of the State of Washington and he shall be allowed thirty days in addition to the statutory five days for such compliance, if such additional time be necessary in order to perfect the title.

"In event that the seller shall be unable to furnish satisfactory title to the buyer within the aforesaid time, the earnest money received hereunder shall forthwith be returned to the buyer, if for any other reason the buyer is

unable to, or refuses to complete the purchase in accordance with the terms herein, the earnest money shall be the property of Leo & Wellman Business Sales as liquidated damages.

LEO & WELLMAN BUSINESS SALES
"By H. G. Jensen [signed]
"Agent for Seller
"[signed] Merton Charles Stewart, Sr.
"[signed] Merton Charles Stewart, Jr.
Buyer

Seller"

(This was plaintiffs' exhibit A and does not bear the seller's signature, but it is undisputed that Ralph K. Moss signed another copy on April 20th.)

It will be noted that the earnest-money receipt is on a form evidently intended to be used in the sale of going businesses, and that it makes the sales in bulk act applicable to the sale of a logging truck and trailer, and that it is silent on one of the most important elements of the contract, *i.e.*, the date on which the truck and trailer were to be delivered to the purchasers. (Needless to say, it was not prepared by a lawyer.) Particular attention is directed to the provision relative to perfecting title.

The "Affidavit and List of Creditors" required by the bulk sales act was likewise signed by Mr. Moss on April 20th, but it was not filed until April 22nd. On that date, the second payment of $500 was due under the terms of the earnest-money receipt, but it is undisputed that the Stewarts paid $2,500 on that date.

Mr. Stewart, Sr., testified that the additional payment of $2,000 was made on April 22nd to secure possession of the truck and trailer; that Moss at that time said he had some logs to haul, but agreed that he would deliver the truck and trailer to the Stewarts within a few days; that Howard A. Leo, one of the brokers, told him at that time and in the presence of Moss, that the equipment was free and clear and that it "had gone through the Bulk Sales"; that a few days later Moss refused to deliver the truck and trailer until the entire purchase price had been paid; that he (Stewart, Sr.) then went to the National Bank of Washington in Tacoma

to borrow money on the equipment to pay off the $2,500 balance on the purchase price, and there learned for the first time that the Kent branch of that bank held a mortgage on the truck and trailer; that he then telephoned Moss, who agreed to meet him the next day at the brokers' office for the purpose of going to Kent and making the necessary arrangements to pay off the chattel mortgage; that Moss failed to keep the appointment, and that he (Stewart, Sr.) went to Kent and discovered that the mortgage was in excess of $3,600 and that the payments thereon were delinquent. (It will be remembered that the Stewarts had paid $3,000 of the purchase price and only $2,500 remained to be paid.)

Mrs. Celia Stewart, the wife of Mr. Stewart, Sr., who was present at the meeting in the brokers' office on April 22nd, testified that on that occasion Moss said that, if they would pay the $2,500 which they did pay on that date, they could have possession of the truck and trailer.

Moss denied that he ever promised possession of the truck and trailer to the Stewarts and testified that, when he signed the earnest-money receipt of April 20th, both of the Stewarts (father and son) were present and were advised of the mortgage and that his bankers would not let the truck and trailer go into the hands of anyone else as long as the bank had a mortgage against the equipment, and that he could not give them possession of the truck and trailer until the mortgage was satisfied. Moss also denied that he had promised to meet Mr. Stewart, Sr., at the brokers' office, for the purpose of going to Kent to see about a release of the mortgage. (Moss did not make any explanation as to why the Stewarts paid $2,500 on April 22nd instead of the $500 called for by the earnest-money receipt.)

Howard Leo, one of the brokers, could not remember whether the Stewarts were present when Moss signed the earnest-money receipt and the bulk sales affidavit on April 20th. He did remember that Mr. and Mrs. Stewart, Sr., and Mr. Stewart, Jr., were present in his office with Moss on April 22nd, when the $2,500 payment was made, but he had no knowledge or recollection of any conversation relative

to possession of the truck and trailer. (He, likewise, had no plausible explanation of why the Stewarts paid $2,500 instead of $500 on April 22nd.)

Moss knew that the Stewarts had no way of getting the money to complete the payment of the purchase price unless they could put a mortgage against the truck and trailer; and this they could not do until the existing mortgage was satisfied.

On May 20th, Moss, by his attorney, wrote the Stewarts calling attention to the fact that the payment due on May 18th had not been made, and that the final payment would be due on May 24th.

On May 24th, the Stewarts, by their attorney, demanded the return of the $3,000 which they had paid.

It is undisputed that no payments were made by Moss on the mortgage from April 19, 1946, until August 3, 1946, when he sold the truck to third parties and paid off the mortgage.

To summarize the situation: The Stewarts had paid $3,000 on the $5,500 purchase price of the truck and trailer; and Moss, who at all times retained possession of the truck and trailer, had an equity of less than $1,900 therein, because the mortgage thereon amounted to more than $3,600. Instead of applying the $1,100 which he had received over and above the amount of his equity on the mortgage, and then either transferring the truck and trailer to the Stewarts, subject to the reduced mortgage, or escrowing the transaction so that the Stewarts could borrow enough on the truck and trailer to pay off the balance of the existing mortgage, Moss sought to keep both the $3,000 and the truck and trailer, relying upon the earnest-money receipt, which he interpreted as calling for the payment of the full purchase price by the Stewarts before he was obligated to clear title to the truck and trailer or to deliver possession thereof.

This action was commenced by the Stewarts against Moss and wife, and against Howard A. Leo and wife and Steve C. Wellman and wife, doing business as Leo & Wellman Business Sales, and certain other defendants, to recover the $3,000 which the Stewarts had paid for the logging truck

and trailer. The brokers, Leo and Wellman, and the other defendants demurred to the complaint, and the demurrers of all the defendants except Mr. and Mrs. Moss were sustained. We shall hereafter refer to Mr. Moss as though he were the only defendant and appellant.

His theory at the time of the trial was that the Stewarts were obligated to complete their payments on May 24th, while he (Moss) had until May 27th to clear title to the truck and trailer (thirty-five days after April 22nd, the date on which the affidavit and list of creditors under the bulk sales act was filed in the auditor's office), and that, the Stewarts being in default for failure to make the payments due on May 18th and 24th, he was relieved of the necessity of clearing title to the truck and trailer and had the right to terminate the contract and retain the payments made.

This outraged the sense of decency and justice of the trial judge, who, in no uncertain terms, labeled the transaction a scheme on the part of Moss to "grab" the $3,000 and keep the truck and trailer. The trial court entered judgment for the Stewarts in the sum of $3,000. From that judgment, this appeal is taken.

We have here a situation which does not readily fit into any of the generally recognized patterns covered by the law of sales. (Incidentally, most of the cases cited to us in the briefs had to do with the law pertaining to executory real-estate contracts and were not directly applicable to the present problem.) The dominant fact which limits what would be the usual rights of a seller in the case of a defaulting purchaser is, in this case, the bad faith of the seller.

The trial court repeatedly inquired of Moss and his broker, Leo, why they had not co-operated with the Stewarts to protect the interests of all parties by transferring the truck and trailer, subject to the mortgage, or by escrowing the transaction so that the Stewarts might secure the necessary financing to complete the purchase. The only answer was that they were not obligated so to do; in other words, it was not so "nominated in the bond."

Appellant relies on the following statement from *Hansbrough v. Peck*, 5 Wall. 497, quoted by us in *Neis v. O'Brien*,

12 Wash. 358, 41 Pac. 59, 50 Am. St. 894, where it is said:

" 'No rule in respect to the contract is better settled than this: That the party who has advanced money, or done an act in part performance of the agreement, and then stops short and refuses to proceed to its ultimate conclusion, the other party being ready and willing to proceed and fulfill all his stipulations according to the contract, will not be permitted to recover back what has thus been advanced or done.' "

In that case, Neis had agreed to purchase 20,000 pounds of hops from O'Brien at 17¢ a pound ($3,400). Four cents a pound was to be paid on the execution of the contract; 4¢ a pound was to be paid on September 1st; and 9¢ a pound was to be paid upon delivery of the hops. The first two payments, aggregating $1,600, were made. The hops were tendered and refused, and O'Brien thereafter sold them to third parties for 13¾¢ a pound ($2,750). Neis sued to recover the payments made ($1,600) less the damage O'Brien had sustained ($750) by the sale at 13¾¢ a pound instead of 17¢, making a total recovery sought of $950. The court applied the rule above set forth and denied recovery. O'Brien had performed the contract in every detail, and there was no legitimate excuse for Neis' failure to accept the hops and complete the payments required by the contract.

The same rule, relied upon by appellant, is even more forcefully stated in *Rounds v. Baxter*, 4 Me. 454:

"It is a proverbial principle that a man is not permitted, in a court of justice, to take advantage of his own wrong or neglect. The principle is founded in the highest reason. If a man, after he has made a fair contract, and partially fulfilled it, may, without the consent, or any fault, on the part of him with whom he has contracted, rescind the agreement, excuse himself at once from all further concern about it, and recover back whatever he has paid, he may speculate and disappoint and injure his neighbor whenever his interest or his passions may dictate; and thus triumph over him in security and enjoy, himself, a complete indemnity. Justice will not sanction such a proceeding."

We desire to point out, however, that the rule relied upon is subject to many exceptions. There are cases where the reasons which support it do not exist and where the default

is clearly not willful or deliberate, but the result of circumstances over which the defaulting party has no control. In such circumstances, where there is a substantial and unjust enrichment of a person in a position similar to that of the appellant here, beyond any damage he has sustained by the default of a party analogous to these respondents, who has acted in good faith, the courts have, on various theories and by varied reasoning, permitted the party in default to recover the amount paid over and above the actual damage occasioned by that default. *Remington Arms U.M.C. Co. v. Gaynor Mfg. Co.,* 98 Conn. 721, 120 Atl. 572; *Cherry Valley Iron Works v. Florence Iron River Co.,* 64 Fed. 569; *Michigan Yacht & Power Co. v. Busch,* 143 Fed. 929.

It is recognized that this matter of the right and the amount of recovery by a party in default presents one of the difficult problems in the law of contracts.

"Few questions in the law have given rise to more discussion and difference of opinion than that concerning the right of one who has materially broken his contract without legal excuse to recover for such benefit as he may have conferred on the other party by part performance of an indivisible contract or by the performance of an indivisible fraction of a divisible portion of a contract. A satisfactory solution is not easy, for two fundamental legal policies seem here to come in conflict. On the one hand, it seems a violation of the terms of a contract to allow a plaintiff in a default to recover—to allow a party to stop when he pleases and sell his part performance at a value fixed by the jury to the defendant who has agreed only to pay for full performance. On the other hand, to deny recovery often gives the defendant more than fair compensation for the injury he has sustained and imposes a forfeiture on the plaintiff. The mores of the time and place will often determine which policy will be followed. But the second of these opposing policies has steadily increased in favor in recent years. Except where the obliquity of the defective performance is of a sort that indicates moral obliquity, and where, therefore, the courts feel that the one who is in default may properly be penalized, the tendency is to grant him restitution if a substantial net benefit has accrued to the defendant by partial performance." 5 Williston on Contracts (Rev. ed.) 4118, § 1473.

The mores of this time and place require that a seller who has at all times retained possession of the subject matter of the sale may not, upon the default of the purchaser, retain the payments made by the purchaser, if that default has been occasioned by the conduct of the seller in refusing to co-operate with the purchaser in the usual and customary methods and procedures by which such sales are ordinarily effectuated and by which the interest of both parties could have been adequately protected.

This does not put the burden of doing anything beyond the strict requirements of his contract upon the seller if he is content with the damages which he may sustain by the default of the purchaser, but merely puts upon him the extracontractual obligation of common honesty and fair dealing if he seeks to enrich himself substantially beyond his actual damages by retaining the payments which the purchaser has made. We are not here concerned with the right of offset in the amount of his actual damage, because there is no evidence of any damage, and, for aught we know, the sale later made by appellant may have been more advantageous than the one with which we are here concerned. (No error has been assigned because of the trial court's refusal to admit evidence of the price for which the truck and trailer were finally sold.)

There was a provision in the earnest-money receipt to the effect that

" . . . if for any other reason the buyer is unable to, or refuses to complete the purchase in accordance with the terms herein, the earnest money shall be the property of Leo & Wellman Business Sales as liquidated damages."

Appellant, in his claim of right to retain the $3,000, has made no distinction between the $500 earnest-money payment and the $2,500 payment. The brokers' right to claim the $500 is not before us, though they were tendered the opportunity to litigate that issue by being made parties defendant. Mr. Leo, one of the brokers, upon being called as a witness, testified that he had in his possession the entire sum of $3,000 paid by the respondents and disclaimed any interest therein, but later, in a contempt proceeding, he said

that his firm expected to receive $500 if the appellant prevailed. By reason of this situation, we see no necessity to differentiate, if indeed there is any basis therefor, between the $500 and the $2,500 payments.

We have decided the principal question presented on the basis of assumptions most favorable to the appellant, namely, that the respondents had defaulted in their payments a few days prior to the date on which appellant was required to clear title to the truck and trailer, and that the appellant was thereby excused from tendering either possession of the truck and trailer or good title thereto and could treat the contract as terminated. We have held that, even in that situation, he could not retain the payments made, under the circumstances existing in this case. We desire to make it clear that we are not holding, or even intimating, that the respondents' default excused a tender of performance by the appellant before he could terminate the contract, or that the appellant was not himself in default at all times after May 27th.

▇ Although not discussed in the briefs, it seems to us clearly established that, as to $2,000 of the $2,500 payment made on April 22nd, there was a failure of consideration. The contract provided for payment of $500 on that date, and the elder Stewart and his wife both testified that the additional $2,000 was paid for the purpose of securing immediate delivery of the truck and trailer, and that appellant promised delivery within a few days if they would make the $2,500 payment on that date. Moss denied this and said that the bank would not permit him to make delivery of the truck and trailer while it held the mortgage. The trial court ridiculed this explanation by Moss, and it is equally unconvincing to us. The preponderance of the credible evidence clearly establishes that $2,000 was paid in consideration of a promise which was not performed.

We find no prejudice to the appellant in the trial court's order that the witness Leo pay the $3,000 which he had received from the respondents, and which he held for the appellant, into the registry of the court. The witness had expressed willingness so to do and had disclaimed all in-

terest in the fund. Appellant urges that the court had no jurisdiction of the witness Leo to enter such an order, because he was not before the court as a party litigant. This order was made toward the end of the trial and was not complied with. Mr. Leo gave the money, or a check for it, to appellant's attorney instead of paying it into the registry of the court as directed. When it was brought to the attention of the trial judge that the money had not been paid into the registry of the court, he issued an order, on April 12, 1947, directing Mr. Leo and appellant's attorney to show cause, on April 19th, why each of them should not be adjudged in contempt of court. When it developed, on the hearing on the order to show cause, that appellant's attorney had possession of the check, the court found them both guilty of contempt and entered an order that they each

" . . . be sentenced to ten days in the County Jail, unless within thirty minutes from the pronouncement of the court's order, to wit: thirty minutes from 11:30 a. m. April 19, 1947, they deposit the sum of $3000.00 into the registry of the court."

It was not until this hearing that the witness Leo claimed a contingent interest in $500 of the $3,000, and then only in the event the appellant should prevail in this action.

It clearly appears that the payment of the $3,000 was not made into the registry of the court in consequence of the court's order made during the trial, which order was deliberately ignored, but was made in consequence of the order made in the contempt proceeding to which Mr. Leo and appellant's attorney definitely were parties, and from which order neither of them has appealed.

We are satisfied that there is nothing in appellant's second contention which warrants a modification of the judgment by returning to Mr. Leo the money paid by the respondents which he had held as agent for the appellant.

The judgment is in all respects affirmed.

MALLERY, C. J., BEALS, STEINERT, and JEFFERS, JJ., concur.

May 28, 1948. Petition for rehearing denied.